**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x

In re:

                                            Case No. 22-41414-nhl

MENDEL PANETH

                                            Chapter 11

                                  Debtor

---------------------------------------------------------------------x

## DECLARATION PURSUANT TO LOCAL RULE 1007-4

MENDEL PANETH, the Debtor in this case hereby submit the following Declaration pursuant to Local Rule 1007-4 to provide relevant background information to the Court as to the reasons for this individual chapter 11 case.

      1.      The debtor is not a small business debtor within the meaning of Bankruptcy Code § 101(51D).

      2.      The debtor is not a "single asset real estate debtor" within the meaning of Bankruptcy Code §101(51B).

      3.      This is an individual chapter 11 case. I am not "in business", but rather am the owner of a single-member limited liability company named Hundred Publications, LLC ("Hundred"). The LLC has not filed for Chapter 11 relief. Hundred was formed in January 2021.

## OVERVIEW

      4.      I am a 39-year-old Hasidic man with a wife and five children. I am a graphic designer, editor and historian. I came to this country in 2002 from Antwerp, Belgium, where my father is a Rabbi, as was his father and five other generations of rabbis before him.

      5.      In the fall of 2014, I decided to open a business which would publish a weekly magazine in Yiddish, catering to Ultra-Orthodox Jewish youth. Although there were several other such publications, I believed that with my particular skills, I could develop a unique product which would be both entertaining and would serve my goal of enlightening these youngsters to worldly matters in a fashion that was not inconsistent with strict religious guidelines. The format would be that of a comic book which would tell stories, some in a serial fashion, sold both in grocery stores and by subscription.

      6.      To further this objective, I inquired in my community as to a source of financing and was introduced by Elye Nadler ("Nadler") to David Reiner ("Reiner"), said to be a wealthy businessman, who might be interested in helping me.

      7.      Reiner expressed interest. We entered into a "Partnership Agreement" written in Hebrew (by a rabbi who was a classmate of Reiner), on October 24, 2014, and a few days later

Reiner formed Kidline Enterprises Inc.("Kidline"), although he never gave me any of the legal or banking papers.

    8.    Under the terms of the Partnership Agreement,

    a. My role was to operate "each and every aspect" of the business. Reiner's role was to invest the necessary funds to get the business started with an initial investment of $150,000 (which was repaid within the first year).

    b. We each received a 45% interest. Nadler would serve as an intermediary between Reiner and I, and would be a 10% owner.

    c. Unanimous consent was required for major decisions such as financing for the business, selling shares in the company or taking in a new partner.

    d. If Nadler wanted to sell his shares Reiner and I would each have the right to half.

    e. Reiner would be repaid his $150,000 investment gradually out of profits; and I would receive the next $150,000 in profits, with subsequent profits to be shared in accordance with ownership percentages.

    f. I would receive a weekly salary; there was no provision for Reiner to receive compensation other than return of his investment or a share of profits.

    g. We agreed to deal in fairness and in loyalty to the company, and specifically agreed that that no partners could receive kickbacks

    h. We agreed that <u>"if it will be determined that a partner has, for any reason whatsoever, embezzled the partnership account and withdrew a sum of money that he is not entitled to according to this agreement, that the principal be returned, and the other partners are entitled to remove him from the business without paying him any money for his partnership interest."</u>

    i. Joint signatures (or authority) would be required for all checks

    j. I agreed not to leave the company for five years.

    k. I would be subject to a covenant not to compete for three years after ceasing to be a partner.

    l. We agreed to arbitration of disputes pursuant to Jewish Law

    9.    Over the next <u>eight years</u>, as will be discussed below, Reiner has consistently breached the Partnership Agreement with impunity and engaged in a course of conduct which has hijacked both Kidline any my personal life, prevented me from making a living, and causing me to be taken by ambulance to the psychiatric section a hospital for emergency treatment.

    10.    Although Reiner's bad conduct started shortly after we started Kidline, I had made a practice of "looking the other way" to further the larger objective of making the business successful. However, after <u>four and one-half years</u> of Reiner's dishonesty and self-dealing, I

Page **2** of **19**

decided on seeking outside assistance by triggering the Arbitration provision our Partnership Agreement. I consulted with Rabbi Moshe Bergman who was recommended to me as <u>a Mediator</u> I explained to him that I was looking for a quick and relatively inexpensive rabbinic solution by a single mediator, rather than a full-blown trial with a 3-rabbi court (Beis Din), to economically resolve our partnership dispute.

11. Unfortunately, through corruption of the rabbinic arbitration Reiner has coopted Rabbi Bergman into becoming his facilitator. This has not only prevented a resolution of our business dispute but has placed me into a <u>perpetual quicksandish-nightmare from which I have unable to escape, although I have bent over backwards to participate in that Arbitration process in good faith.</u>

12.     **The purpose of this Chapter 11 case is to provide me breathing space to enable me to use my talents in new and constructive ways so I can once again support my family, and hopefully also bring about a resolution of my disputes with Reiner.**

13.     The precipitating event triggering this filing was the impending continuation of so-called Rabbinic Arbitration before Rabbi Bergman who had scheduled a hearing on **Monday June 20, 2022**. This case was filed the day before.

14.     Prior to the filing of this case, I had obligingly participated in **NINTEEN SESSIONS** <u>between May 11, 2020, and February 2, 2022</u>, comprised of no less than 107 session-hours for which Rabbi Bergman has charged $400 per hour (notwithstanding a purported Arbitration Agreement citing a $300 hourly fee). Moreover, although the Arbitration Agreement said that the charges were to split between the two parties, it appears that Rabbi Bergman charged me the full $400 per hour both for hearing sessions and for work outside of hearings. .At $400 per hour <u>just for the 107 in-session hours, that amounted to $42,800.</u>. These so-called Arbitration Sessions have produced no results other than providing an income stream for Rabbi Bergman and his scheduling of **ELEVEN MORE SESSIONS** between June 20,2022 and July 13, 2022 and booking his anticipated fees for such sessions..

15.     In addition to paying Rabbi Bergman, I have had to pay even greater amounts for my own legal fees, as well as fees for a personal Rabbinic Advisor (who, like Rabbi Bergman bills $400 per hour) to attend these hearings for the purpose of guiding me as to Jewish Law.

16.     I believe the sole purpose of these extended proceedings, besides the financial benefit to Rabbi Bergman, is <u>to fulfil Reiner's objective</u> of making me run out of funds, so I would not appear for a scheduled session, after which Rabbi Bergman would declare a default and make a ruling against me, making Reiner the sole owner of Kidline.

## TIMELINE

### Reiner's Pre-Arbitration Conduct

17. We commenced production of Kidline Magazine, with myself managing creation and production, and my wife, Sarah ("Sury") handling bookkeeping, day-to-day financial operations, and distribution as and employee.

18. Before we started production, Reiner introduced us to his brother Yossi, who operated JCR Printing, Inc. to do our printing, but Yossi said he was not interested until we were printing at least 5,000 copies per week. That surprised me because, to my knowledge, JCR was a small company that printed wedding invitations and had never before produced a magazine

19. The first issue was published in **December of 2014**. The business did well, but friction developed with Reiner.

20. When we reached the 5,000 copy level in **February 2015**, Reiner insisted that we switch to his brother's company, Based upon Reiner's continued insistence and assurances that we would receive better pricing, I agreed. It was not until several years later, when I complained to Reiner about the high cost of printing, and researched alternatives, that I discovered that his brother had actually subcontracted this work to another printer and was charging us three times his actual costs. No doubt, Reiner shared in those overcharges, notwithstanding the specific language in the Partnership Agreement prohibiting kickbacks.

21. On or about **March 8, 2016** in violation of the specific provisions of our Partnership Agreement providing for equal splitting of Nadler's shares, should he wish to sell, Reiner told me that he was personally buying out all of Nadler's 10% interest for his sole benefit, and that I had no choice in the matter.

22. This made Reiner a 55% owner of the company, leaving me with a minority interest: a second clear violation of the Agreement requiring us to be equal owners. I would never have signed a partnership agreement if I, as the creative force, had a minority interest.

23. Compounding this violation, I discovered that Reiner had actually used Kidline capital funds of $100,000 to make this purchase. This diversion of corporate funds for personal use, constituted a third violation of our Partnership Agreement. (see paragraph 8(h), above)

24. The depletion of our working capital, radically reducing our bank balance was a fourth violation of the Agreement. At this point I was starting to feel that I was trapped in a cage. . I knew he was wrong, but my wife and I were both working for Kidline and if we left, neither of would have any income to support our family.

25. Knowing of the strong desires of my wife and I to buy a house, Reiner created a trap for us. He referred us to a friend of his to get a mortgage. The friend reported that we would be in stronger position to get a mortgage if Sury was the owner of Kidline and I was just an employee. Thus, **towards the end of 2016**, contrary to my wishes and based solely upon the recommendation of Reiner and his friend, and Reiner's promise to put the stock back in my name after the house closing, I transferred my 45% interest to Sury, she qualified for a mortgage and on May 24,2017 we bought the house. After the closing, I asked Reiner numerous times to

Page **4** of **19**

put the stock back in my name. He always refused, saying at one time "If you don't trust your wife then that is your problem". In hindsight, I now see how ironic it was that Reiner unilaterally caused Nadler to transfer his 10% interest to himself yet saw nothing inconsistent with his refusal to give consent to my wife's transfer of shares back to me.

26.     Also in **2016,** without my consent, and in violation of the Partnership Agreement, Reiner claims to have transferred a 20.75% interest in Kidline to Yoel Klein. This shocked me more than Reiner's acquisition of Nadler's 10% interest, because our Agreement prohibited bringing in new partners without unanimous consent. Furthermore, I was aware of Mr. Klein's reputation and was extremely uncomfortable having such a person as a partner

27. In **May of 2017** we found a new location from which to operate the company. The rent was approximately $7,200 per month. Reiner falsely told the landlord that the company's name was **Kindline** LLC (rather than Kidline Enterprises Inc.) and that I was the sole owner of that company The landlord required a personal guarantee. Reiner told me that I had to sign it.

28.     In **November of 2017**, for no apparent reason, Reiner insisted that we change telephone provider from our existing company, Vocatec to TeleGo Inc, a company used by Abaline Paper Products, Inc, another business he owned.  I agreed.  With the assistance Abaline employee Avi Boas accomplished that transfer.

29.     As a marketing tool we created a "publishing museum" at Kidline's plant, and advertised it to summer camps and private tours In **June of 2020** as we built up interest in this unique attraction, we reported to Reiner that we needed to change the phone provider because the service was severely defective. Voice messages (which was the only way we received business from the Orthodox community, which did not allow use of the internet) were not being saved. Calls were constantly dropped. The lines were full of static. We wanted to switch to a new, reliable carrier. At that point we discovered that Avi Boas from Abaline, was the Administrator of Kidline's TeleGo account.  After much effort, we successfully transferred the service to Telebroad, <u>but Reiner caused the transfer to be reversed</u>. Eventually, we obtained a new number and restored service, but we effectively lost an entire summer's museum revenue, invested large sums in advertising the new number and caused extreme confusion with our customer base. We concluded that this was part of Reiner's master plan to take 100% control of Kidline.

30.     On **May 8, 2020**, I was referred  to Rabbi Moshe Bergman, as a "Third Party" <u>experienced in mediation of business disputes</u>.. I had tried very hard to be a cooperative partner with Reiner, but it was becoming apparent that Reiner had a self-serving objective inconsistent with our 2014 Partnership Agreement. I did not want to create a war between us, but rather, consistent with the provision in our Partnership Agreement, sought rabbinical assistance to resolve our problems consistent with Jewish Law, in a simple, short and economical fashion, with a single person, rather than engaging a full 3-judge rabbinical court. Rabbi Bergman assured me that he could accomplish this in as little as two sessions.

**First Round of Bergman Arbitration**

31.     In **May of 2020** we had three arbitration sessions, sitting together with Rabbi Bergman, in which I presented my complaints with Reiner's conduct and Reiner had the chance

to respond. After the third session on **May 14, 2020**, Rabbi Bergman turned to me and said "You won! But you will have to split up." Since he concluded that we could not continue as partners he directed us to both submit names of business appraisers so he could select one to value the business. He said that I would have the first right to buy out Reiner, that I would be allowed to reduce my share of the purchase price by the value of my claims against Reiner.

32. On **May 19, 2020,** I complied with Rabbi Bergman's request and submitted the name and number of an appraiser.

33. It appears that Reiner did not comply.

34. Rabbi Bergman requested Reiner's phone number and I provided it on multiple occasions over the next several weeks, the last time being on **June 2, 2020**.

35. Rabbi Bergman did not return my texts or calls.

36. **On the morning of June 10, 2020,** rather than comply with Rabbi Bergman's direction to provide him with the name and phone number of an appraiser, and in furtherance of Reiner's strategy for taking control, Reiner undertook a course of action designed to maximize pressure on my wife and I so we would walk away from Kidline and Reiner could become sole owner.. He removed Sury's access the Kidline Chase checking account which she had sued since the beginning of the business (originally as bookkeeper, and by then as 45% shareholder which we used on a daily basis to run the business (which had a balance of over $200,000 giving access only to himself and refused to authorize payments by wire, ECF or check of current and ordinary operating expenses (including employees) for Kidline, making it impossible to conduct business, and wreaking havoc in our day-to day operations. Upon advice of counsel, we opened a new Kidline account in a different bank, without giving Reiner access, so the company could stay in operation.

37. To protect ourselves against future interference by Reiner, I started researching alternatives to printing, other than using Reiner's brother, and discovered the fraud referred to above, in which Yossi Reiner had outsourced our printing work and was grossly overcharging us, retaining the spread for himself and his brother, in violation of the Partnership Agreement.

38. Since Bergman, rather than concluding with the agreed 2 meetings, is now calling for additional meetings, the costs for me personally were becoming prohibitive., I therefore requested that Bergman direct that all payments for Arbitration be paid by Kidline. **He never responded.**

39. On **June 12, 2020** , our lawyer sent letter, requesting that Rabbi Bergman to issue an interim decision excluding Reiner from access to the company bank accounts and to authorize our application to the Supreme Court for an injunction. Bergman's response was to schedule four more Arbitration Sessions with him, on **June 24, July 1, September 9 and September 10.**

40. In **September,** our attorney emailed Rabbi Bergman requesting an interim arbitration decision, limited to Reiner's role in causing a major disruption of our phone service through TeleGo (discussed below).

41. At the final hearing of **September 10, 2020** Bergman and Reiner's lawyer (Israel Vider) realized that any decision made could only be enforceable against me, yet at that point I was no longer a shareholder of Kidline: My wife had taken over my shares. Furthermore, although I had (supposedly, although I have never seen a signed copy) signed an Arbitration agreement with Bergman, Sarah never did. Thus, Bergman demanded that Sarah sign an arbitration agreement before a decision was made. She initially refused. Then I was told that if she did not sign, Bergman would issue a very, bad judgment against me...

42. Based upon a condition that her signed Arbitration Agreement would be held ih escrow and only be released upon delivery of JCR Printing's books and records to determine what we were overcharged, and whether David Reiner was ever paid, Sarah came to Rabbi Bergman's office but did not want to go into the room. Bergman went downstairs to obtain her signature. When he returned a discussion arose as to who would notarize her signature. Bergman and Vider decided that Vider, who was a Notary, would take the document to his office to notarize it, notwithstanding the he was not present when Rabbi Bergman met with my wife. Neither my wife, nor I have ever seen the executed and "notarized" Agreement. Since the conditions for its release have never been met, she takes the position that she is not subject to the jurisdiction of Rabbi Bergman's proceedings.

43. On **October 1, 2020** Bergman issued an Interim Decision granting Reiner access to our new Kidline account; (yet failing to require Reiner to restore our full access to the Chase Kidline account); directing that we provide Reiner with access to all financial records, emails and passwords (yet failing to direct Reiner to do the same as to Kidline); and directing joint authorization for all checks or money transfers. Bergman also directed the scheduling of two additional months of arbitration hearings. The request by my wife's attorney for a decision on Reiner's role in the Telego fiasco was ignored. **Nothing was mentioned as to his prior oral decision for a sale of Reiner's interest to me or the direction for us to provide appraisers, or my request to have arbitration fees paid by Kidline, instead of Reiner and myself personally.**

## Litigation

### Against Telego

44. In **August of 2020**, after the first two of these four additional sessions, Sury (who, as shareholder, bookkeeper and operations manager was running daily affairs at Kidline) decided to change phone providers from Telego (the company Reiner had insisted we switch to in 2017) to a new provider, Telebroad, LLC.. This was because Telego had provided unsatisfactory service for years. By this time, service disruptions, full mailboxes, and poor quality had reached the breaking point. Since Kidline's clientele was limited to using the telephone for interacting with the company, flawless phone service was critical. Furthermore, this was the busiest season for summer camp and family visits to the Interactive Kidline Publishing Museum.

45. During the transfer to the new provider discovered and advised us that Telego's equipment had been used to surreptitiously record phone calls without the consent of the parties.

Page **7** of **19**

<u>This occurred during the course of the pending Arbitration, and included calls made between myself and my wife, and between us and with our attorneys.</u>

46. Telebroad's technician asked us if we wanted all that recorded information transferred to the new system, and if so asked us for our administrative login credentials. We told them that we had no idea what they were. Then it struck us that Reiner's employee at Abaline, Avi Boas, who had nothing to do with Kidline was the person who supervised Telego's initial installation in 2017, and that he must still be the Administrator of Kidline's phone account.

47. Telego, interfered with the transfer of service to Telebroad,, and eventually we had to obtain a brand new phone number. The consequence was an extreme loss of business.

48. On **August 24, 2020**, Sury, individually and on behalf of Kidline commenced an action in Supreme Court, Kings County against Telego, Index Number 515628/2020

49. Eventually it was determined that Reiner, <u>acting against the interests of Kidline</u>, had personally instructed Telego to reverse Sury's instructions to change provider. Rabbi Bergman was advised of this by my attorney, but did nothing about it, Thus, on **September 17, 2020** an Amended Complaint was filed and **November 11, 2020 a** proposed Second Amended Complaint was filed, to add David Reiner and Yoel Klein as <u>co-defendants in this action on behalf of Kidline against Telego.</u>

50. On **December 15, 2020**, at a Status Conference in this case, the attorney for Reiner and Klein announced to Judge Baley-Schiffman that he was <u>working a settlement</u> and requested an adjournment of pending motions. Based upon this request the judge adjourned all motions to **January 21, 2021.**

51. The so-called settlement negotiations were merely a trick. Reiner clearly was trying to obtain full ownership of Kidline for only a nominal amount of money. I discovered that during that period Reiner diverted $167,000 from Kidline's bank account, intended to be part of a settlement, to his own personal use, which was <u>a clear violation of the Partnership Agreement provision stating that such an event automatically triggered expulsion from the company with no payment. (see paragraph 8(h), above)</u>

52. Then on **January 18, 2021** the same attorney who claim he was trying to settle the case filed a comprehensive motion:

To Compel my wife and I to return to arbitration
Staying and enjoining us from taking action against Reiner, Klein and Kidline in the Richmond
    County Action (see below) or any other forum pending conclusion of the Arbitration.
Consolidating the Richmond County Action into the Telego case
Dismissing the Complaint for lack of subject matter jurisdiction based upon arbitration
    agreements of 10/24/14 and 3/8/16)
Dismissing the Complaint based upon documentary evidence
Dismissing the complaint for failure to state a cause of action
Dismissing the complaint because "the Paneths" do not have legal capacity as minority
    shareholders

Dismissing the complaint based upon collateral estoppel and res judicata
Dismissing the complaint because the agreement provides that Jewish law controls   (Documents 72-79;

53.    By Order dated **April 8, 2021** (filed as document 117) this action (and others, recited below, consolidated into it) was referred out to continue arbitration with Rabbi Bergman.

54. The consolidated action involves thirteen causes of action including:

AS AGAINST DEFENDANT TELEGO INC. (1) Intentional Interference with Kidline's Relationship with Kidline's clientele; (2)Willful and Reckless breach of duties and Gross Negligence for failing to transfer phone service to another carrier when requested, failing to set up voicemail and secretly recording conversations; (3) Breach of duties under contract by failing  to provide services; (4) Interference with customers and vendors, recording and sharing confidential information with David Reiner;

AS AGAINST DEFENDANTS DAVID REINER AND  YOEL KLEIN (5) Rescission of Partnership Agreement for Fraudulent Representations; (6) Declaratory judgment to void non-compete clause and waiver of dissolution in contract; (7) Declaratory judgment that David Reiner has forfeited his interest in Kidline Enterprises Inc, by the express terms of the Partnership Agreement by reason of his fraudulent conduct;

AS AGAINST DEFENDANTS INFINITE SOLUTIONS NY INC AND CHAIM KOHN (8) Aiding and Abetting Breach of Fiduciary Duty; (9) Unauthorized use of a computer ("hacking" Kidline's computers;

AS AGAINST  DEFENDANTS JCR PR9INTING INC AND YOSSI REINER (9) Aiding and Abetting Breach of Fiduciary Duty; (10) Fraud; (11) Aiding and Abetting Fraud; (12) Conversion;; (13) Unjust Enrichment.

55.Total damages claimed are compensatory and punitive damages as well as attorney's fees and costs in an amount to be determined at trial, but no less than $16,500,000.

### Against Reiner and Klein

56.    On **October 6, 2020**, after it became apparent to my wife and I that Rabbi Bergman was being influenced by Reiner, we jointly commenced an action in Supreme Court, Richmond County against Reiner and Yoel Klein (to whom Reiner conveyed (in violation of the Partnership Agreement) a portion of his then 55% ownership interest in Kidline), to rescind the Partnership Agreement.  Index Number 151765/2020

57.    On **January 12, 2021**, Vider and Klein's local counsel in Staten Island docketed a letter to Judge DiDomenico requesting an extension of time to Answer until **January 19, 2021,** on the grounds that Israel Vider, the principal attorney for Reiner and Klein  was working a settlement of the litigation.

58. On **January 18th, 2021** Reiner and Klein's attorneys filed the comprehensive motion in the Telego case in Kings County, referred to above, seeking to consolidate the Richmond County action into the Telego action, to dismiss the complaint and to order the parties to continue Arbitration with Rabbi Bergman.

59. By Order dated **April 8, 2021** (filed as document 117) in the Telego action, this action was consolidated in to the Telego action and then dismissed.

### Against Infinite Solutions and Chaim Kohn

60. This suit was brought in Supreme Court, Richmond County on **February 9, 2021** by Sury, individually and on behalf of Kidline against Reiner's Computer Consultant for breaking into Kidline's offices by disabling our security cameras, hacking into my Kidline computers and email during the course of Arbitration with Rabbi Bergman and forwarding that information to Reiner. Index Number 150287/2021.

61. By Order dated **April 8, 2021** (filed as document 117) in the Telego action, this action was consolidated in to the Telego action

### Against JCR Printing In, and Yossi Reiner

62. This suit was brought in Supreme Court, Richmond County on **February11, 2021** by Sury, individually and on behalf of Kidline against the printing company owned by Reiner's brother, and his brother individually for aiding abetting Reiner's breach of fiduciary fraud, aiding and abetting fraud, conversion and unjust enrichment Index Number 150309/2021

63. By Order dated **April 8, 2021** (filed as document 117) in the Telego action, this action was consolidated in to the Telego action

### Hundred Publications, LLC

64. On **January 19, 2021**, the day after Reiner's attorney, under the guise of working on a "Settlement Agreement", filed a surprise comprehensive motion in the Telego case, to send me back to the same arbitrator who had been corrupted by Reiner, I decided to move on, and set out on my own.

65. The five-year minimum commitment I made under the Partnership Agreement expired at the end of October 2019.

66. The three-year covenant not to compete under the Partnership Agreement expired three years from the end of 2016 when Reiner made Sury the shareholder instead of me, thus, no later than the end of 2019, I became "a free agent".

67. I therefore decided, based upon Reiner's seven-year game-plan to use me to make millions for himself and through numerous devious schemes to gain 100% ownership of the company built upon my (and my wife's) hard work without paying a dime.

68.     I thus formed a single-member LLC named Hundred Publications, LLC to further my creative work free of the poison of Reiner.

69.     On or about **February 7, 2021** I published my last edition of Kidline Magazine and resigned as Editor in Chief and announced that I would be moving to a new magazine: "Hundred".

70.     **On February 14, 2021** I published the first issue of Hundred Magazine

### Reiner's Collateral Attacks against me

71.     From the moment I announced my resignation as Editor in Chief of Kidline and move to Hundred Reiner engaged in a multi-prong program to attack my reputation and prevent distribution of Hundred Magazine.

72.     A social media platform called "Hasidic 1" which publishes Hasidic gossip that people send in, received and published false and defamatory comments about me. The publisher came to my house and apologized to me, admitting the defamatory comments came from Reiner and his new staff at Kidline'

73.     In the community Reiner started to spread lies that I had stolen the company from Reiner (not true, for Kidline magazine is still being published to this day, although neither myself or my wife are working there); and the were sinful people for going to a secular court. All this was very harmful to my new Hundred Magazine, because it is community reputation which determines whether a family will trust an individual or a company with their children's' activities and reading.

74.     Reiner's next attack was to our distribution system. Hundred, like Kidline was sold through Jewish grocery stores. To prevent stores from selling my magazine, Reiner enlisted Rabbi Asher Landau of Beis Yoseph in Boro Park who after hearing only Reiner, and without giving me the opportunity to provide input, threatened to issue a "writ "stating, in effect, that my publication of Hundred Magazine was a theft from Kidline, and that any store that sold Hundred Magazine would be in violation of this Rabbinical Writ..

75.     When the rumor of such impending writ came to me, I hired a lawyer who wrote to Beis Yoseph in or about **February 15, 2021**, warning that such action would be unjustified and have legal consequences. The letter had no effect; however: the writ was issued on **February 24, 2021**, and its message delivered to a great number of my grocery-store distributors. This tactic was highly effective. Many store owners threw out my magazine rather than selling it.

76.     Notwithstanding this smear campaign, I believed I still had hope for my new magazine, because there are many sects of Hasidim, and Rabbi Landau represented only one such sect. Word of my predicament went throughout the community. I received solicitations from the secretaries of two different 3-judge Jewish Courts ("Beis Din). If I agreed to hire their courts they promised a review of Judge Landau's unilateral action, and thus a ruling which would allow distribution of Hundred magazine. Alternatively, if I did not sign up for a 3-judge

tribunal, these two courts would issue decisions confirming Rabbi Landau's one-sided writ, and thus their respective sects would join with Landau's embargo.

77.    I signed up with one such court, but notwithstanding their promise to prevent issuance of the writ, it was issued anyway, and Reiner, himself participated in warning store owner not to sell my magazine.

78.    On **March 2, 2021,** I broke down under this immense pressure and upon return from work. I could not get out of my car. A Hatzolah ambulance arrived and took me to the hospital for treatment.

### The Court Decision

79.    As stated above, on **April 8, 2021** Judge Baley-Schiffman ruled in the Telego case that all four lawsuits would be held in her court, and consolidated into one; that my direct action against Reiner and Klein for rescission of the Partnership Agreement would be dismissed, and that all others would have to go back to Arbitration with Rabbi Bergman.

80.    As soon as my wife's attorney filed a Notice of Appeal from this Order, we received a tidal wave of pressure from rabbis to abandon the appeal because anyone who went to the secular courts would be considered a sinner.

81. Reiner, himself also participated in the pressure campaign to return to Bergman's arbitration. He had previously induced one of my graphic artists to leave Hundred and return to Kidline. Now he convinced my proofreader, my principal writer and my distributor to tell me that they would Hundred unless the appeal was dropped.

82. Having both agreed to proceed with Bergman's Arbitration, we were told that the Beis Yoseph Stay would be removed: it never was.

### Second Round of Bergman Arbitration

83.In compliance with Judge Baley-Schiffman's direction we returned to Arbitration on **April 30, 2021 for** session one of Round 2. We appeared at a total of 12 sessions, in this second round, comprised of 65 ½ hours, the last of which was oh February 2, 2022. There were no further hearings after that because we had a car accident, and our car was totaled.

84.    After a session on **May 7, 2021,** my attorney, David Scharf, wrote the following email to Rabbi Bergman, asking him to remove himself as Arbitrator for numerous examples of bias:

> Rabbi Bergman, frankly this schedule given on Friday evening when you
> have known, because you excused participation in this afternoons
> originally scheduled, that I am committed for this afternoon, is impossible
> to meet. And it deprives our client of due process and sufficient time and
> notice to appear for a trial that you have now for the first time proved a
> defined schedule. There is no proper arbitration that provides this notice
> which amount to no notice.

Page **12** of **19**

> This seems nothing more than another action taken by you where you have had ex parte communications with Mr. Vider, or his office and you do his bidding. Having commented the way he did before you without a court reporter, and in view of the prior conduct of intimidation and harassment that you participated in you must recuse yourself as my client clearly cannot get a fair hearing.
>
> Indeed, Mr. Reiner admitted in your presence by holding his hands wide apart of at least 12-14 inches that he paid Rabbi's a pile of bills as a bribe for their taking his side.
>
> Your glib comment that there are no conflicts shows that you do not take the issue of conflict seriously in that you have made no effort to ascertain the names of witnesses and parties and have failed to disclose prior maters that you have had with counsel their advisors and the parties.
>
> No waiver contained in any arbitration agreement that you participated in coercing by telling my client that if she did not sign an agreement to arbitrate would result in an adverse ruling against her husband can result in a waiver of all due process except the right to counsel.
>
> You must and have not provided minimal due process and notice and you certainly do not appear to be impartial in the face of a party who gloats that he bribes Rabbis.

85. Notwithstanding the blatant corruption exposed by my attorney Mr. Scharf in the above email, we <u>continued to actively participate in Ten additional hearings</u> between **June 16, 2021** and **February 2, 2022,** in the hope that such an email would lead Rabbi Bergman to adjust his approach and pursue the track of justice. In retrospect, such hope was unjustified.

86. Our side was not allowed to present its case <u>until the 11th session after Judge Baley-Schiffman had ordered us back to Arbitration</u>. That occurred on **January 18, 2022.** . My attorney's request for a court reporter was denied. After our presentation, Bergman scheduled <u>eleven more sessions</u>, to be conducted between **June 20, 2022 and July 13, 2022** (which were never held) to enable <u>Reiner to continue to present his side of the case..</u>

87. On **February 7, 2022**, the Rabbi Mendel Gold, my retained Rabbinical Advisor for the Rabbinical Arbitration resigned, with the following email: (translated from Hebrew)

> To Mr. Mendel h. Paneth to whom it may concern
> My greetings to all
>
> I want to let you know after several hearings that I appeared as your rabbinical adviser, and in particular the last hearing to remove the rabbinical lien -The rabbinical lien is not really a lien, it is just a **judgment** against you.

> After my request from the Rabbi *(arbitrator)* that this can't be possible to continue in hearings and in the same time that other party is directing a battle of arrows and catapults against u, causing you great damage, and making your life bitter, in the same time that every hearing is costing u close to twenty thousand dollars, and the Rabbi *(arbitrator)* told me clear that according to halacha; this lien (ikul) is null and void.
>
> It is clear to me that there is no discussion here at all to find out the truth for real, and a decision has already been made.
>
> And in light of the fact that I was asked by **the Beis Yoseph court** to appear in front of them regarding the rabbinical lien, and what I heard from **the Beis Yoseph court** are really things that cannot be put in writing at all, that even if we are now being debated on Kindline.
>
> And those hearings by Rabbi Bergman have already cost upon thousands more than a hundred thousand for your side, and even after you have signed arbitration regarding the rabbinical lien,
>
>> They have no intention of \want to cancel their verdict, and I was most shocked at what Rabbi Asher Landau *(one of the rabbi's in Beis Yoseph court)* told me, who is under the rabbinical lien, **will nail human hair** *(and a expression in old Hebrew as a mind-blowing corruption)*, because of that I decided that I cannot continue as a rabbinical adviser, and with that I resign and you will have to find new rabbinical counsel to help you with the hearings by Rabbi Bergman
>> ,
>
> Rabbi Mendel E. Gold

88. In March **and early April 2022**, prior to Passover, our busiest season, Reiner, bringing a rabbi with him, went to a number of large supermarkets and forced them to remove our magazines, relying on the Beis Yoseph Writ. of **February 2021**. When stores refused to comply, Reiner engaged youngsters to go into these stores and cover up my magazine so customers could not see it. This was done, notwithstanding that the purpose of the Writ was <u>to compel me to participate in Arbitration</u>, and, in fact, I had participated in Arbitration with Rabbi Bergman for twelve sessions between April 30, 2021 and February 2022.

89. **<u>This is additional evidence that Reiner's sole objective now was to put Hundred out of business and to take sole control of Kidline using any tactic he could think of, legal or not, without either him buying me or, or my buying him out, as Rabbi Bergman had originally when Reiner and I met with him in May 2020.</u>**

90. On **May 8, 2022** due to Reiner's destruction of my distribution system, I published the final edition of Hundred.

91. I filed this chapter 11 case on **June 19, 2022**, one day before the scheduled continuation of hearings before the Arbitrator, Rabbi Moshe Bergman. I was forced to take this step because my good-faith participation in two rounds of "Religious" Arbitration was met with nothing other than bias and corruption.

92. **Reiner's corruption of the Arbitration process was, simply put, a war of attrition through which he felt he could make me disappear by drying up all my sources of income.**

93. It is my intention to use this protected forum as a place from which I can peacefully strive to develop a new source of income to support my family, and where hopefully I may find assistance in obtaining an unbiased resolution of this seven-year business dispute with my former partner David Reiner.

94. This case was not originally commenced under chapter 7, 12 or 13.

95. No committee was organized prior to the Order for relief herein.

96. The 20 largest general unsecured creditors (excluding insiders) are as follows:

**Name: American Express**

**Address: PO Box 981540 El Paso, TX 79998**

**Phone: (800) 528-4800**

**Person familiar with Debtor's account:**

**Amount of Claim: $11**

**is the claim contingent? NO**

**Is the claim unliquidated? NO**

**Is the claim disputed? NO**

**Is the claim partially secured? NO**


**Name: Capital One Bank**

**Address: 4515 N Santa Fe Avenue Oklahoma, OK 73118**

**Phone: 877-893-8820**

**Person familiar with Debtor's account:**

**Amount of Claim: $5,956.91**

**is the claim contingent? NO**

**Is the claim unliquidated? NO**

**Is the claim disputed? NO**

**Is the claim partially secured? NO**

**Name:  JP Morgan Chase**

**Address: P O Box 9013 Addison, TX 75001**

**Phone: 800-766-7751**

**Person familiar with Debtor's account:**

**Amount of Claim: $14,066.86**

**is the claim contingent? NO**

**Is the claim unliquidated? NO**

**Is the claim disputed? NO**

**Is the claim partially secured? NO**


**Name: Chase Card Services**

**Address: P.O. 15298 Wilmington, DE 19850**

**Phone: (800) 432-3117**

**Person familiar with Debtor's account:**

**Amount of Claim: $15,257.00**

**is the claim contingent? NO**

**Is the claim unliquidated? NO**

**Is the claim disputed? NO**

**Is the claim partially secured? NO**


**Name: Verizon Wireless**

**Address: 500 Technology Dr, Ste 599 Weldon Springs, MO 63304**

**Phone: 800-922-0204**

**Person familiar with Debtor's account:**

**Amount of Claim: $223.00**

**is the claim contingent? NO**

**Is the claim unliquidated? NO**

**Is the claim disputed? NO**

**Is the claim partially secured? NO**

**Name: LVNV Funding**

**Address: PO Box 10587, Greenville, SC 29603**

**Phone: 877-264-0587**

**Person familiar with Debtor's account:**

**Amount of Claim: $1,925.14**

**is the claim contingent? NO**

**Is the claim unliquidated? NO**

**Is the claim disputed? NO**

**Is the claim partially secured? NO**

97.     The five largest secured creditors are as follows:

Name: Freedom Mortgage]

Address: P.O. Box 7730, Pasadena, CA 91109-7230

Amount of Claim $800,000

Description of collateral: First mortgage on residence

Value of the collateral $1,800,000

Is the claim disputed? No

Is the lien disputed? No

Name: Huntington National Bank

Address: 41 Sough High Street, Columbus, OH, 43215

Amount of Claim $115,000

Description of collateral Home Equity Line of Credit

Value of the collateral: $1,800,000

Is the claim disputed? No

Is the lien disputed? No

98.     The Debtor's assets and liabilities are summarized as follows:

Assets

    Real Estate $1,800,000.00

    Vehicles $31,000.00

    Hundred Publications, LLC $600,000

    Claims against others: $16,500,000

Liabilities

    Mortgages $915,000.00

    General Unsecured Creditors $37,439.00

99. None of the stock or securities of the debtor are publicly held.

100. None of the debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

101. The debtor operates Hundred Publications, LLC from his home.

102. The debtor has no employees

103. Projected income for the 30 days following the case filing is the amount necessary to pay his living expenses

104. The Debtor's significant assets are located at his home: equipment belonging to Hundred Publications, LLC

105. The debtor's books and records are located at his home

106. The debtor holds no assets outside the territorial limits of the United States.

107. The amount paid and proposed to be paid for services for the 30-day period following the filing of the chapter 11 petition: N/A

108. For the 30-day period following the filing of the chapter 11 petition, the following schedules shows the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, and other information relevant to an understanding of the foregoing: Draw from Hundred Publications, LLC or other personal services entity sufficient to pay household living expenses.

109. Additional information regarding the Debtor's rehabilitation prospects I have recently been given the opportunity to write, design and publish a magazine insert for a particular ultra-orthodox community. Since the filing of this case, I have traveled to Holland and Germany to collect material for this project and have commenced work on this project. This project will provide immediate cash-flow so I can support my family. If this publication is well-received, I expect it to trigger additional work.

110. It is my hope that through the independent and unbiased process of Chapter 11 I will be able resolve my business dispute with Mr. Reiner and re-start my efforts to provide for my family.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 21,2022

                                                      */s/ Mendel Paneth*
                                                      Mendel Paneth