UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re                                                    Chapter 11

      Mendel Paneth,                           Case no.  22-41414

               Debtor.
---------------------------------------------------------x

## NOTICE OF HEARING

        PLEASE TAKE NOTICE, that a telephonic hearing will be held on November 1, 2022 at 11:00) am. (the "Hearing") before the Honorable Nancy H. Lord, at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York to consider the annexed application of David Reiner ("Reiner") for the entry of an order compelling arbitration under the Federal Arbitration Act, and vacating the automatic stay under 11 U.S.C. § 362(d)(1) so that arbitration may proceed.  Those intending to appear at the hearing must register with eCourt Appearances no later than two days prior to the hearing. The phone number or video link for the hearing will be emailed to those that register with eCourt Appearances in advance of the hearing. Instructions for registering with eCourt Appearances: https://ecf.nyeb.uscourts.gov/cgi-bin/nyebAppearances.pl.

        PLEASE TAKE FURTHER NOTICE, that objections, if any, must be in writing, served upon the undersigned, and filed with the Clerk of the Bankruptcy Court, with a courtesy copy to the Honorable Nancy H. Lord's chambers, so as to be received at least seven (7) days before the Hearing date.

Dated: New York, New York
      September 23, 2022

                              BACKENROTH FRANKEL & KRINSKY, LLP

                  By:    s/ Mark Frankel
                         800 Third Avenue
                         New York, New York  10022
                         (212) 593-1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re                                  Involuntary Chapter 11

      Mendel Paneth,                   Case no.  22-41414

                     Debtor.

---------------------------------------------------------x

## **MOTION TO COMPEL ARBITRATION**

David Reiner ("Reiner") and Kidline Enterprises Inc. ("Kidline," with Reiner, the "Movants"), as and for their motion for the entry of an order compelling arbitration under the Federal Arbitration Act, and vacating the automatic stay under 11 U.S.C. § 362(d)(1) so that arbitration may proceed, respectfully represents as follows:

**(a)**      **The parties agreed to arbitrate, as determined by the Arbitrator, and the Debtor was then ordered to arbitrate by the Supreme Court and the Appellate Division,**

**(b)**      **Although the issues may be "core" procedurally, substantively the outcome rests on non-bankruptcy law,**

**(c)**      **Since the arbitration must nonetheless proceed against the non-debtor Suri Paneth, denying the motion will result in continued adjudication in both forums, and could result in duplicative litigation and inconsistent judgments, and**

**(d)**      **It is unfair to force the Movants to relitigate with the Debtor in this Court, in addition to arbitration with his wife in Rabbinical court, despite the Debtor's contractually agreement to and subsequent participation in arbitration –until the Arbitrator started ruling against him.**

## **BACKGROUND**

### **The Formation and Ownership of Kidline**

1.       In or about September 2014, Reiner, Eli Nadler ("Nadler") and the Debtor agreed to enter a joint venture to publish a Yiddish magazine for children.

2.      In a nutshell, (a) Reiner would fund the new venture, (b) Nadler would oversee the finances and report back to Reiner, and (c) the Debtor would be the editor-in-chief responsible for the editorial content of the magazine.

3.      The Debtor, on his own, with no involvement from Nadler or Reiner retained Joel Katz ("Katz") to draft a "Joint Venture"[1] agreement governing the joint venture of the publication of the envisioned magazine and related businesses of the Joint Venture.

4.      On September 24, 2014, the Joint Venture Agreement prepared by Katz was forwarded by the Debtor to Nadler, who forwarded it to Reiner.  This was the first draft of the Joint Venture seen by Nadler and Reiner.  The Debtor changed the first draft of the Joint Venture Agreement and forwarded this second draft to Nadler, who forwarded it to Reiner on October 22, 2014.

5.      Neither Reiner nor Nadler played any direct part in drafting the Joint Venture Agreement.  Never, did either Reiner or Nadler (or anyone on their behalf) ever communicate directly with Katz, the drafter of the Agreement, or change the draft Joint Venture Agreement.

6.      On October 23, 2014, Reiner, Nadler and the Debtor executed the Joint Venture Agreement.  At the time of execution, Reiner and Nadler made only two handwritten changes to the Joint Venture Agreement.  These were the only changes made by Reiner and Nadler.  A copy of the Joint Venture Agreement, in Hebrew, executed by the parties, on October

---

[1] This Joint Venture Agreement is written in Hebrew. A literal translation of the document's heading is "Partnership Agreement."  However, it is, in fact, a joint venture with the agreement envisioning the creation of a corporation.  In Hebrew and Jewish law, joint ventures are generally referred to as "Partnerships." Hence, the agreement is called a Partnership Agreement although it is actually a Joint Venture Agreement.

23, 2014, (dated (Hebrew date) of 30 Tishrei, 5775) is attached as Exhibit A.  The Hebrew document illustrates that Reiner and Nadler made only two changes to the Joint Venture Agreement prepared by Katz at the request of The Debtor.

7.    Neither Reiner, nor Nadler was represented by an attorney or a Rabbinical Counselor at any time.

8.    The significance of the foregoing is that Paneth has repeatedly asserted the allegations he first made in a Summons and Complaint, e-filed in the Richmond County action, Index 151765/2020 as Doc #1, (attached as Exhibit C (without exhibits)) ¶¶ 12, 15, 17, 18, 21, 22, 23, 62, and in the requested relief request, that he reached a verbal agreement completely at odds with the written Joint Venture Agreement, and he was fraudulently coerced — under the duress [of poverty[2]]— into executing the Joint Venture Agreement by being misled that it contained completely different terms than those actually set forth therein.

9.    Kidline Enterprises, Inc. ("Kidline") was incorporated on October 29, 2014.

10.    The Joint Venture Agreement was executed before the incorporation of Kidline. The Joint Venture Agreement envisioned the creation of an as yet unnamed corporation (see ¶7 of the Joint Venture Agreement) with a proposed name of "The Volkenes." (See first unnumbered paragraph of the Joint Venture Agreement.). The proposed name "The Volkenes" was never used, and, instead, the publication was named Kidline.  The Joint Venture Agreement envisions the creation of different corporations, different publications, different related businesses

---

[2] See ¶¶ 14 and 19(a) of the Summons and Complaint attached hereto as Exhibit C.

and provides that the Joint Venture Agreement will be binding on all of these different publications and entities.  (See Joint Venture Agreement ¶ 4 -7).

11.    The Joint Venture Agreement is not a shareholder agreement.  It contains all of the terms and conditions which would ordinarily be part of a joint venture agreement.  The fact that the Joint Venture Agreement was executed before the incorporation of Kidline, is indicative that the Joint Venture Agreement is a joint venture agreement and not a shareholder agreement (or a partnership agreement), although the envisioned corporation in this Joint Venture Agreement— in this case Kidline — would be governed by the terms of the joint venture (as set forth in ¶ 7 of the Joint Venture Agreement).

12.    The "joint venture" agreement, therefore, covers future entities and future magazines. See ¶ 6 and ¶ 7 of the Joint Venture Agreement.  Note that the translation uses the word "business."  The correct translation should be "venture" or "business venture."

13.    These provisions are relevant because, as described below, The Debtor subsequently created a new entity, 100 Publications, which published a competing publication, which should be covered by the Joint Venture Agreement ¶¶ 4-7.  See also ¶ 3 of the Joint Venture Agreement which provides that the Joint Venture Agreement is for "an unlimited period of time."

14.    In or about March 2016, Reiner purchased Nadler's 10% interest in the joint venture/Kidline, becoming the controlling shareholder with 55%.

15.    Reiner purchased Nadler's 10% interest for $100,000.00, pursuant to a purchase agreement drafted in Hebrew.  This purchase agreement has never been translated. The

Debtor consented and agreed to the purchase agreement in a final paragraph in the purchase agreement which paragraph was separately executed by The Debtor.

16.     The Debtor (and subsequently Sury Paneth, his wife) attempted to challenge Reiner's purchase of Nadler's 10% both at the inception of the rabbinical arbitration proceeding they initiated, and then in a Richmond County Summons and Complaint they filed, attached as Exhibit C, ¶¶ 29, 30, and 31.

17.     The Paneth's challenge to Reiner's purchase of Nadler's 10% is significant — in the Paneth's view — because, according to the Paneths, Reiner and the Paneths were supposed to be 50/50 partners in the Joint Venture. According to the Paneths, if they succeeded in nullifying Reiner's purchase of Nadler's 10%, then Nadler's 10% becomes corporate stock, and Reiner and the Paneths each become 50 percent owners of the Joint Venture/Kidline.

18.     The Paneths' challenge to Reiner's purchase of Nadler's 10% was based on allegations that: (a) the Paneths did not consent to Reiner's purchase of Nadler's 10%; (b) Reiner purchased Nadler's 10% with Kidline corporate funds, (c) Kidline should have purchased Nadler's 10%; and (c) even if Reiner's purchase of Nadler's shares is enforceable, Reiner had to manage the Kidline finances, and Reiner's failure to do so rendered the purchase of Nadler's shares void.

19.     The rabbinical arbitrator (the "Arbitrator") held that Reiner (together with Yoel Klein) are 55% joint venturers/shareholder of Kidline and the Paneths are 45% joint venturers/shareholders of Kidline.

20.     The Arbitrator found that Kidline's corporate books, records (some of which were in Sury Paneth's handwriting) showed that Nadler's shares were not purchased with Kidline corporate funds.

21.     Rather, Kidline loaned Reiner $100,000.  Sury Paneth knew of this loan and consented.  Reiner repaid the loan within three days.  Reiner purchased Nadler's 10% interest with a check from his own bank account made out to Nadler.  Reiner did not have to take over Nadler's responsibilities in the Joint Venture/Kidline.

22.     After purchasing Nadler's 10%, Reiner assigned, with the Paneths' consent, 20.75% of his 55% interest to Yoel Klein, retaining 34.25% for himself.

23.     The Paneths, besides challenging Reiner's purchase of Nadler's 10%, also challenged Reiner's assignment of 20.75% of his interest to Yoel Klein.

24.     The Arbitrator rejected the challenges to Reiner's assignment to Yoel Klein as well.  The Arbitrator found that Kidline's tax returns for 2016, through 2019, were all executed by Sury Paneth as secretary of Kidline showing Reiner's 34.25% ownership and Yoel Klein's 20.75% ownership. The Arbitrator held that the Paneths were well aware, and by executing the tax returns consented to the purchase of Nadler's 10% and thereafter to the Assignment by Reiner to Klein.

25.     In short, the Arbitrator ruled that Reiner and Klein are legitimate shareholders controlling 55% of Kidline. For purposes of the Arbitration, Reiner and Klein agreed that Reiner would represent both of their interests.  Klein subsequently assigned to Reiner his 20.75% in Kidline.  At this time, Reiner is the 55% shareholder of Kidline.

6

26.     The Paneths sought to re-litigate this decision as well in State Court.  See ¶¶ 32-34 of the Summons and Complaint (Doc. 1) e-filed in the Richmond County action, Index No. 151765/2020 attached as Exhibit C.

27.     In the middle of 2017, the Paneths sought to purchase a home but were informed that the Debtor's bad credit rating precluded them from obtaining a mortgage. The Debtor therefore transferred, for no consideration, his 45% shares to Sury Paneth.  Although this was done in 2017, since the corporate tax returns were prepared in 2017, for 2016 — and it was those tax returns upon which the mortgage application would be based — the Paneths backdated the transfer to January 1, 2016. These 2016 Tax Returns were filed in September 2017, and, thus, Sury Paneth represented to the mortgage lender that she owned the shares throughout 2016.

28.     In the middle of 2017, the Paneths purchased the home at 85 Bolivar Street, Staten Island, NY. The Paneths obtained the funds necessary to purchase the property by borrowing $900,000.00, from a mortgage lender (secured by a mortgage on the property) and by Sury Paneth borrowing $500,000.00 in an unsecured loan from Kidline.  Of this amount, $300,000.00 remains outstanding.

29.     The Debtor continued as Editor-in-Chief, and in full control of Kidline as if he was the 45% shareholder although the distributions, starting from 2017, and on, were made to Sury Paneth.

30.     The Paneths have attempted to make a great deal over this no consideration transfer made to Sury Paneth.  The Paneths have claimed that The Debtor no longer worked for, or was a part of, Kidline as of January 1, 2016.  The significance of this date, according to Paneth, is that the three-year period in which he was prohibited from competing commenced in 2016 and ended in 2019.  He was therefore free to compete with the competing

publication "100."  The Arbitrator ruled against the Paneths on this point since there was never notice from the Debtor that he was leaving Kidline, and at the first session, he explicitly claimed that although he had transferred the shares to his wife, in reality, she was simply his nominee.

31.     Indeed, from October 29, 2014, until March, 2021, Mandel Paneth was Editor-in-Chief of Kindline Magazine, and, under ¶¶ 8, 9 and 22 of the Joint Venture Agreement, The Debtor managed all aspects relating to publication and distribution of Kindline Magazine — including all financial decisions relating to publication and distribution.

32.     Since Kidline's business was almost exclusively the publication of Kidline, as a practical matter, The Debtor managed, and was in control, of most matters relating to Kidline. The management and control exercised by The Debtor under ¶¶ 8, 9 and 22 of the Joint Venture Agreement, continued up to and including March 2021.

33.     The Arbitrator found that Paneth exercised control over Kidline at all times, including opening up a separate bank account and locking Reiner out from June 2020, through March, 2021.  Additionally, the last issue of Kidline contained a lengthy interview with The Debtor in which he explained that he (not Sury Paneth) was closing Kidline and opening another publication.

### The Arbitration and Richmond County Actions

34.     The Debtor, upon the advice of his attorney, Israel Goldberg, Esq., selected Rabbi Moshe Bergman as the Arbitrator to arbitrate his claim to ownership of Kidline. David Reiner, the current and then President of Kidline, agreed to arbitrate before the Arbitrator selected by the Debtor, and Kidline, the Debtor and David Reiner executed an Arbitration Agreement, a copy of which is attached as Exhibit F.

35.     In or about June 2020, the Arbitrator orally rejected the Debtor's arguments, informing him that the 55% Shareholders had not forfeited their interest, and that he was not free to shut down Kidline.

36.     The Arbitrator orally ruled that the Debtor's only option was for the Debtor to buy out the 55% shareholders or to have the 55% Shareholders buy him out.

37.     Upon hearing the Arbitrator's oral ruling, the Debtor commenced various actions to lock out the 55% Shareholders.  For example, he opened separate bank accounts to which the 55% Shareholders had no access.

38.     The Debtor then diverted all of Kidline's income, including credit card receipts to bank accounts which only he and his wife controlled, and he locked out, physically and electronically, the 55% Shareholders.

39.     This occurred while the parties were in Arbitration.  Reiner raised these issues with the Arbitrator.

40.     At the Arbitration Hearing, the Arbitrator instructed the Debtor to provide full access to the 55% Shareholders, both physically and electronically, to all records and bank accounts.

41.     The Debtor refused to comply with the Arbitrator's oral ruling to restore the 55% shareholder's electronic and physical access to Kidline and to provide an accounting as to how he had used Kidline's funds for the period in which he locked out the 55% shareholders.

42.     On October 1, 2020, the Arbitrator issued an Interim Award requiring the Debtor and his wife, Sury Paneth, to restore the 55% Shareholder's access to Kidline, physically and electronically. A copy of the Interim Award issued by the Arbitrator is attached as Exhibit G.

43.    The Paneths, in response to the Arbitrator's Interim Award, commenced an action in Supreme Court, Richmond County, Sarah Paneth a/k/a Suri Paneth and Mendel Paneth, Individually and on behalf of Kidline Enterprises, Inc., v. David Reiner and Yoel Klein, Supreme Court, Richmond County, Index # 151765/2020, and sought by Order to Show Cause, a stay of the arbitration. A copy of the Order to Show Cause seeking the stay of arbitration is attached as Exhibit B, with the Interim Relief crossed out and a notation "Ordered Interim Relief Denied as per record of 10/8/20."

44.    In this Richmond County Action, the Debtor is named as a plaintiff in the caption.  He executed a corporate verification on behalf of Kidline.  A copy of the Summons and Complaint showing the Debtor as a named plaintiff in the caption with the corporate verification executed by the Debtor, is attached as Exhibit C. See also Consent to Change Attorneys attached as Exhibit D, executed by the Debtor "individually, and on behalf of Kidline Enterprises Inc.

45.    Besides commencing the Richmond County Action, the Paneths commenced another three actions against Kidline vendors who refused to follow their orders to change the accounts of Kidline to lock out the 55% shareholders. Those actions were: *Sarah Paneth a/k/a Suri Paneth and Mendel Paneth, Individually and on behalf of Kidline Enterprises, Inc., v. David Reiner and Yoel Klein,* Supreme Court, Richmond County, Index # 151765/2020*, Kidline Enterprises, Inc. v. Tele Go, Inc.,*  Supreme, Kings, Index # 515628/2020*; and SARAH PANETH a/k/a SURY PANETH, individually and on behalf of Kidline Enterprises, Inc., Plaintiff/Petitioner v. Infinite Solutions NY Inc. and  Chaim Kohn, Supreme Court,* Richmond County, Index# 150287/21.

46.     On January 18, 2021, Kidline and David Reiner moved to consolidate the four actions filed by the Debtor and to compel arbitration. A copy of the Notice of Cross Motion filed by Kidline and David Reiner is attached as Exhibit E.

47.     In response to Kidline's Motion to Compel Arbitration, on January 19, 2021, the day after receiving Kidline's Motion to Compel Arbitration, the Debtor formed One Hundred Publications LLC.

48.     The issues of Kidline were usually produced approximately three weeks before the publication date. The Debtor, from January 19, 2021, until February 9, 2021, ceased producing Kindline, and, instead, used Kidline's employees, equipment and space to produce One Hundred.

49.     Kidline's only income producing asset was its publication Kindline.  The Debtor by ceasing publication of Kindline destroyed Kidline's value to Zero.  Kidline — as per its Tax Returns — was earning a net profit of $500,000 per annum before the Debtor shut it down. A measure of damage caused by the Debtor to Kidline is that $1,700,000 has been expended, to date to restart the magazine Kindline.

50.     And the Debtor caused an additional loss of $300,000 to Kidline.  As noted above, the Debtor borrowed $500,000 from Kidline to finance the purchase of his luxury $1,800,000 well-furnished home.  This amount was to be paid back by December 31, 2019. However, of this amount $300,000.00 remains unpaid by the Paneth's to Kidline.

51.     By Order dated April 21, 2021, the Supreme Court, Kings County, consolidated all four actions filed by the Debtor and Sury Paneth issuing an Order compelling

arbitration and dismissing all four actions. A copy of the Court Order compelling arbitration and dismissing all the actions filed by the Paneths is attached as Exhibit W.

52.     The Debtor appealed the Supreme Court's Order compelling Arbitration and dismissing the actions and moved, by Order to Show Cause for a stay. The Appellate Division denied the request for a stay, and a copy of the Order to Show Cause submitted by the Paneths to the Appellate Division with the TRO crossed out by the Appellate Division is attached as Exhibit T.

53.     After the denial by the Appellate Division of the TRO, the Debtor withdrew and discontinued the Appeal. The application to withdraw the Appeal is attached as Exhibit U.

54.     After the Supreme Court issued its order compelling Arbitration, the Arbitrator attempted to schedule Arbitration Hearings.  The Debtor and his wife, Sury Paneth, through their attorneys, attempted to adjourn the Arbitration hearings.  For example, in response to the Notice of Arbitration Hearing issued on April 15, 2021, the Debtor's attorneys responded with an improper affidavit of engagement essentially cancelling most scheduled dates.  A copy of the Affirmation of Engagement is attached as Exhibit V. Additionally, after arbitration dates were scheduled on dates selected by the Paneths and their attorneys, the Paneths and their attorneys continuously requested adjournments.

55.     Although the Court issued the Order Compelling Arbitration, on April 8, 2021, after all the adjournments and cancellations, the Arbitration Hearings had not yet concluded over a year later, although there had been, in that year, eleven (11) hearings, totaling 59.5 hours, at which hearings the Debtor accompanied by Rabbinical Arbitration experts to assist him and attorneys from Morrison Cohen appeared at every arbitration session.

56.     Because of the delays, cancellations and adjournments by the Paneths and their attorneys, the Arbitrator had scheduled ten arbitration sessions to conclude the long delayed arbitration, commencing on June 22, 2022.  These Arbitration sessions were scheduled by conference call in February and confirmed by email on May 12, 2022, over six weeks before the Hearings. And a Notice of Arbitration was served on all parties.

57.     Seven (7) days before the commencement of the final hearings, Paneth's attorneys requested an adjournment.  The adjournment was denied, and to prevent the final Arbitration Hearings from taking place, the Debtor filed this Bankruptcy proceeding on Friday June 17, 2022, at 4:00 pm, before the final arbitration hearings were set to commence on the Monday June 20, 2022.

**Examples of Improper Transfers**

58.     Upon locking out the 55% shareholders, the Paneths treated Kidline as their own personal pocketbook, using at least of $1,086,396.57 of Kidline's funds for their personal expenses and/or to benefit another entity — One Hundred Publications LLC (an LLC in which the Debtor is the sole member).  Examples of Kidline funds used by the Debtor for his own personal expenses are: Lease payments for a Lincoln Navigator in the total amount of $23,203.15 (Exhibit H), payment of the Debtor's personal loans $25,000 (Exhibit I); payments of the Debtor's personal credit card in the amount of $28,222.39 (Exhibit J); payment of the Debtor's personal loan in the amount of $15,000 (Exhibit K); payments in the amount of $49,316.53 to Corash and Hollander, attorneys never retained by Kidline and who have never provided legal services to Kidline (Exhibit L); and payments in the amount of $2,180.00 to Learn and Discover Childcare (Paneth's children's childcare) (Exhibit M).

59.     Kidline does not have access to all bank records and therefore does not know the extent of looting from Kidline.  For example, the Debtor diverted all credit card payment to Kidline to an account to which Kidline has no access.  Before the Debtor diverted the credit card receipts to that account, Kidline collected between $20,000 to $50,000 a month in credit card receipts. Based on previous receipts, the amount which the Debtor diverted from Kidline would total between $180,000 and $300,000 over the nine months the Debtor was in control of Kidline.

60.     In February 2021, the Debtor, in a six-page interview in Kindline, Kidline's publication, announced that he was shutting down Kindline, and continuing the story lines and features of in a new publication, to be named "One Hundred," published by Hundred Publications LLC — an LLC in which the Debtor was, and remains, the sole member.

61.     According to bank records, on January 19, 2021, the Debtor wired the total amount of $290,000.00 (Exhibit O) directly from Kidline's bank account to Hundred Publications' bank account.

62.     Also on January 19, 2021, the Debtor wired $25,000.00 directly from Kidline's bank account for legal fees, to Morrison Cohen (Exhibit N).  Morrison Cohen was never retained by Kidline and provided no legal services to Kidline.  Morrison Cohen has been totally adversarial to Kidline.

63.     In total, even before engaging in discovery, the known bank records show that the Debtor used at least $1,086,396.57 of Kidline funds either for personal expenses or to fund his solely owned One Hundred Publication.

14

64.     Besides looting all of Kidline's funds, the Debtor and his wife looted all of Kidline's physical assets.  In February, 2021, the Paneths removed the sign "Kindline" (Exhibit R) from the door and other spaces of the space rented by Kidline, and replaced it with a sign "Hundred Publications" (Exhibit S).  And the Debtor took possession of all the furniture and equipment of Kidline to produce and publish One Hundred.  The employees of One Hundred were the exact same employees employed by Kidline, and these Kidline employees produced the Debtor's magazine "One Hundred" from the same desks and same computers, using the intellectual property of Kidline.  The format of One Hundred was substantively identical to the format of Kindline with minor changes.

65.     Besides looting all of Kidline's funds and physical assets, the Debtor used $20,000 of Kidline funds to pay a computer technician to export the entire Kidline subscription list to be owned and used by the Debtor individually.  A copy of the agreement to export and transfer the Kidline subscription list to the Debtor is attached as Exhibit Q, and the check of Kidline's funds used to pay for the looting of the subscription list from Kidline to the Debtor is attached thereto (see Exhibit Q).

66.     In or about May 30,2021, the Debtor moved the production facilities of One Hundred to the basement of his luxury $1,800,000.00 home, removing from the Kidline space all the high-end computers and all hard drives, graphic computers and computer servers (Exhibit P), including the servers holding the intellectual property and future story lines purchased by Kidline to be published on a future date. And the Debtor removed all valuable furniture such as conference room tables and chairs.

67.     Additionally, when the Debtor vacated the Kidline space he was one month delinquent on the rental payments in the amount of $8,000.00. Kidline was forced to pay the Debtor's delinquency.

68.     One Hundred continued to be published out of the Debtor's basement until May15, 2022, when it ceased publication, after it could not pay the printer over $100,000 and it fell behind in payroll in the approximate amount of $150,000.

<u>**ARGUMENT**</u>

**(a) Federal Arbitration Act**

69.     The Federal Arbitration Act, 9 U.S.C. § 1, et seq. (the "FAA"), provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. By its terms, the FAA "establishes a 'federal policy favoring arbitration agreements,' and mandates the enforcement of contractual arbitration provisions." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 107 (2d Cir. 2000) (internal citations omitted) (*quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). In light of the "strong federal policy favoring arbitration, the traditional [*Sonnax*] balancing test . . . for seeking relief from the automatic stay does not apply." *In re Cardali*, 2010 WL 4791801, at *4. Rather, in applying the FAA to litigation in bankruptcy cases, courts undertake a four-part inquiry: (1) whether the parties agreed to arbitrate; (2) whether the dispute falls within the arbitration clause; (3) if federal statutory claims are raised, whether Congress intended those claims to be arbitrable; and (4) if the court concludes that some but not all of the claims are arbitrable, whether it should

16

stay the non-arbitrable claims pending the conclusion of the arbitration. See id. at *4–5 (collecting cases).

70.    Here, the parties agreed to arbitrate, as determined by the Arbitrator, the Supreme Court and the Appellate Division.  By the same token, by ordering arbitration, the Arbitrator, the Supreme Court and the Appellate Division all found that the claims against Movants and the Movants' claims against the Debtor fall within the arbitration.

71.    Procedurally, the issues may be "core" with respect to the Debtor upon the filing of proofs of claim.  But the claims arose ". . . from the parties' prepetition contractual relationship, were procedurally core only, and arbitration of the claims would not interfere with any bankruptcy policy." *In re S.W. Bach & Co.*, 425 B.R. 78, 91 (Bankr. S.D.N.Y. 2010) *citing In re Hagerstown Fiber Ltd. P'ship,* 277 B.R. 181, 205 (Bankr. S.D.N.Y. 2002)

72.    In addition, the arbitration concerns not only claims by and between the Movants and the Debtor, but claims by and between the Movants and Suri Paneth, the Debtor's spouse.  Suri Paneth has not filed a bankruptcy petition and the Claimants must proceed against here in arbitration.  Indeed, the Debtor's real property is jointly owned by Suri Paneth, and since the property is up for sale, the Movants must proceed against Ms. Paneth forthwith before the sale proceeds are dissipated.  Since the arbitration must therefore proceed under any analysis, denying the motion will result in continued adjudication in both forums, and could result in inconsistent judgments.

73.    Accordingly, the Debtor should be compelled to continue arbitration.

**(b) The Sonnax Factors**

74.     As noted above, the rule is that the *Sonnax* factors do not apply to a

motion to compel arbitration:

> Because of the strong federal policy favoring arbitration, the traditional balancing
> test under *In re Sonnax Indus., 907 F.2d 1280, 1286 (2d Cir.1990)*, for seeking
> relief from the automatic stay does not apply. See *Hagerstown*, 277 B.R. at 204
> ("*Sonnax* balancing does not apply, and the strong federal policy favoring
> arbitration trumps the usual considerations of judicial economy and efficiency
> which are important factors under *Sonnax*.").

*In re Cardali*, 2010 WL 4791801, at *4.

75.     Even if the Court finds that the *Sonnax* factors apply, the arbitration

should still proceed.  The Sonnax Factors are as follows:

> (1) whether relief would result in a partial or complete resolution of the issues; (2)
> lack of any connection with or interference with the bankruptcy case; (3) whether
> the other proceeding involves the debtor as a fiduciary; (4) whether a specialized
> tribunal with the necessary expertise has been established to hear the cause of
> action; (5) whether the debtor's insurer has assumed full responsibility for
> defending it; (6) whether the action primarily involves third parties; (7) whether
> litigation in another forum would prejudice the interests of other creditors; (8)
> whether the judgment claim arising from the other action is subject to equitable
> subordination; (9) whether movant's success in the other proceeding would result
> in a judicial lien avoidable by the debtor; (10) the interests of judicial economy
> and the expeditious and economical resolution of litigation; (11) whether the
> parties are ready for trial in the other proceeding; and (12) impact of the stay on
> the parties and the balance of harms.

*In re Sonnax Indus., Inc*., 907 F.2d at 1286 (*citing In re Curtis*, 40 B.R. 795 (Bankr. D. Utah

1984)).

76.     (1) Here, compelling arbitration will result in a complete resolution of the

issues between the parties, including the claims between the Movants and non-Debtor Suri

Paneth; (2) the determination of the claims pending in arbitration will affect the outcome of the

bankruptcy case, but since there is little else that must be resolved in the case, will not interfere

18

with case administration, (3) the arbitration does not involve the debtor's current role as a

fiduciary; (4) Rabbinical arbitration is a specialized tribunal with the necessary expertise hear the

Jewish law aspects and interpret the Hebrew language documentation relating to the claims ; (5)

Upon information and belief, the debtor has no insurance covering the claims; (6) the action

involves substantial third party involvement since both of the Paneths are parties to the

arbitration; (7) litigation in the Rabbinical court will not prejudice other creditors since secured

creditors will be paid from the sale of the Debtor's real property and the remaining creditors are

credit card companies with small claims relative to such creditors' size; (8) the Movants submit

that equitable subordination does not apply; (9) the Movants submit that judicial lien avoidance

does not apply; (10) the interests of judicial economy and the expeditious and economical

resolution of litigation support arbitration since the matter has been pending in arbitration for two

years; (11) final arbitration proceedings were scheduled but not conducted only because they were

stayed by this case; and (12) there is more harm in forcing the Movants to relitigate with the

Debtor, in addition to continuing to arbitrate with his wife, than any harm to the Debtor by forcing

him to complete the arbitration that he contractually proposed, and subsequently agreed to

undertake.

77.    Section 4001(a)(3) stays the enforcement of a lift stay order for 14 days

unless the Bankruptcy Court orders otherwise.  Here, no purpose is served by staying relief and

Reiner seeks a waiver.

## <u>CONCLUSION</u>

WHEREFORE, the Reiner respectfully requests that the Court enter an order granting the relief requested herein, and that the Court grant such other relief as may be just and proper.

Dated:      New York, New York
            September 23, 2022

                        **BACKENROTH FRANKEL & KRINSKY, LLP**
                        Attorneys for David Reiner

                        By:      <u>s/Mark A. Frankel</u>
                                800 Third Avenue
                                New York, New York 10022
                                (212) 593-1100